FILED
CLERK, U.S. DISTRICT COURT
2/1/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>SAVANA CARTER,<br><br>       Defendant. | CR No. 2:24-cr-00069-JLS<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy to Commit Wire Fraud] |

The United States charges:

[18 U.S.C. § 371]

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

Defendant and the Relevant Entities

1. Defendant SAVANA CARTER was a resident of Menifee, California.

2. Co-Conspirator Amber Singleton, also known as "Crystal Kelly," aka "Rebecca Lee," aka "Rebecca A Lee," aka "Rebecca Ann Lee," aka "Mia Lockett," aka "Mia Peire Lockett," aka "Crystal McClellan," was a resident of Canyon Lake, California.

3. Co-Conspirator Emanuel Tucker, aka "Steve," was a resident of Canyon Lake, California, where he lived with Co-Conspirator Singleton.

4. Company 1 was a Wyoming-based corporation that specialized in selling aged "shelf companies" (i.e., companies that were created and existed without any operations but provided the imprimatur of an established entity) that were incorporated in New Mexico, Montana, and Wyoming.  The shelf companies were home-based businesses that were entirely owned by one person.  Upon receipt of an application and payment for an aged shelf company, Company 1 provided various documents and services for each aged shelf company it sold, including Articles of Incorporation/Organization, a Certificate of Good Standing, an operating agreement and bylaws, and registered-agent services until the year following the year the shelf company was purchased.

5. Between in or around December 2018 and in or around May 2020, defendant CARTER, with the assistance of Co-Conspirators Singleton and Tucker, and others, purchased aged shelf companies from Company 1, including Ireland Solutions Inc. and Market Data Inc., a Montana company (collectively the "Shelf Companies").

The Paycheck Protection Program

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to Americans suffering economic harm as a result of the COVID-19 pandemic.  One form of assistance provided by the CARES Act was the authorization of United States taxpayer-funded forgivable loans to small businesses

for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

7. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. One such certification required the applicant to affirm that "[t]he [PPP loan] funds w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to acknowledge that "I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

8. A business's PPP loan application was received and processed, in the first instance by a participating financial institution approved by the United States Small Business Administration ("SBA"). If a PPP loan application was approved, the participating financial institution funded the PPP loan using its own monies. The SBA guaranteed the loans funded under the PPP.

9. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on

1  mortgages, rent, and utilities.  The PPP allowed the interest and
2  principal on the PPP loan to be entirely forgiven if the business
3  spent the loan proceeds on these expenses within a designated period
4  of time and used at least a minimum amount of the PPP loan proceeds
5  towards payroll expenses.
6      10.  The PPP also allowed certain eligible borrowers that had
7  previously received a PPP loan to apply for a second PPP loan, with
8  the same general loan terms as their first PPP loan.  These "second-
9  round" loans could be used for the same purposes as were permitted
10 for the first PPP loans, including payroll costs, interest on
11 mortgages, rent, and utilities.
12     <u>The Economic Injury Disaster Loan Program</u>
13     11.  The Economic Injury Disaster Loan ("EIDL") program was an
14 SBA program that provided low-interest financing to small businesses,
15 renters, and homeowners in regions affected by declared disasters.
16     12.  The CARES Act authorized the SBA to provide EIDL loans of
17 up to $2 million to eligible small businesses experiencing
18 substantial financial disruption due to the COVID-19 pandemic.
19     13.  To obtain an EIDL loan, a qualifying business was required
20 to submit an application to the SBA and provide information about the
21 business's operations, such as the number of employees, gross
22 revenues for the 12-month period preceding the disaster, and cost of
23 goods sold in the 12-month period preceding the disaster.  In the
24 case of EIDL loans for COVID-19 relief, the 12-month period was the
25 12-month period from January 31, 2019, to January 31, 2020.  The
26 applicant was also required to certify that all of the information in
27 the application was true and correct to the best of the applicant's
28 knowledge.

14.  EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor.  If the application was approved, the amount of the loan was based, in part, on the information provided by the applicant about employment, revenue, and cost of goods sold.  Any funds issued under an EIDL loan were issued directly by the SBA.

15.  EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

B.   THE OBJECT OF THE CONSPIRACY

16.  Beginning in or around April 2020 and continuing until at least in or around April 2021, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendant CARTER conspired with others known and unknown to the United States Government to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C.   MANNER AND MEANS OF THE CONSPIRACY

17.  The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

   a. Between in or around April 2020 and in or around April 2021, defendant CARTER, with the assistance of Co-Conspirators Singleton and Tucker, and others, purchased the Shelf Companies from Company 1 for the purpose of obtaining federal government loans.

   b.   Between in or around April 2020 and in or around April 2021, defendant CARTER, Co-Conspirator Singleton, and others submitted and caused to be submitted electronic applications for PPP and EIDL loans on behalf of companies that defendant CARTER owned and

5

controlled, including the Shelf Companies that defendant CARTER and Co-Conspirator Singleton previously purchased from Company 1.

   c. Defendant CARTER, Co-Conspirator Singleton, and others knowingly made and caused to be made false statements to financial institutions in connection with the applications for PPP loans, including false statements about (i) the number of employees at the relevant company; (ii) the amount of average monthly payroll for those employees; (iii) the truth and accuracy of all the information and documents submitted in or with the applications, including attached Internal Revenue Service ("IRS") forms; and (iv) the intended use of the loan proceeds, including false certifications that the loan proceeds would be used for permissible business purposes.

   d. Defendant CARTER, Co-Conspirator Singleton, and others knowingly made and caused to be made false statements to the SBA in connection with the applications for EIDL loans, including false statements about (i) the number of employees at the relevant company; (ii) the gross revenue for the 12-month period preceding the identified disaster; (iii) the cost of goods sold in the 12-month period preceding the identified disaster; (iv) the truth and accuracy of all the information and documents submitted in or with the applications; and (v) the intended use of the loan proceeds, including false certifications that the loan proceeds would be used for permissible business purposes, certifying to the SBA under penalty of perjury to "use all the proceeds" of the loans "solely as working capital to alleviate economic injury caused by disaster" consistent with the terms and limitations of the EIDL program.

   e. After the financial institutions and the SBA funded the applied-for PPP and EIDL loans, respectively, defendant CARTER, Co-Conspirator Singleton, and their co-conspirators transferred and caused to be transferred the proceeds of the fraudulently obtained loans to bank accounts in their control.

   f. Defendant CARTER transferred portions of the loan proceeds obtained as a result of the fraudulent applications to Co-Conspirators Singleton and Tucker in the form of "kickback" payments.

   g. Defendant CARTER, Co-Conspirator Singleton, and other co-conspirators used the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit in a manner inconsistent with the requirements of the PPP and EIDL programs.

 18. In total, between in or around April 2020 and in or around April 2021, Co-Conspirator Singleton, and others, with the knowledge and consent of defendant CARTER, submitted and caused the submission of fraudulent PPP and EIDL loan applications listing defendant CARTER as the owner of applicant companies or applicant, and transmitted these applications via interstate wires to the SBA and participating financial institutions, resulting in the funding and disbursement of approximately $1,043,897 in loan proceeds.

D. <u>OVERT ACTS</u>

 19. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant CARTER, Co-Conspirator Singleton, and others, committed the following overt acts, among others, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere:

 <u>Overt Act No. 1</u>: On or about April 30, 2020, defendant CARTER, Co-Conspirator Singleton, and others filed and caused to be

filed with a financial institution a PPP loan application seeking $166,660 on behalf of Ireland Solutions Inc., falsely representing that Ireland Solutions Inc. had ten employees and average monthly payroll of $87,583.34.

Overt Act No. 2:   On or about June 18, 2020, defendant CARTER, Co-Conspirator Singleton, and others filed and caused to be filed with the SBA an EIDL application in the name of Ireland Solutions Inc., falsely indicating that Ireland Solutions Inc. had eleven employees as of January 1, 2020, and gross revenues in the amount of $1,100,000 from January 31, 2019 to January 31, 2020.

Overt Act No. 3:   On or about June 24, 2020, defendant Carter Co-conspirator Singleton, and others filed and caused to be filed with the SBA an EIDL application in the name of Market Data Inc., falsely indicating that Market Data Inc. had seven employees as of January 1, 2020, and gross revenues in the amount of $875,000 from January 31, 2019 to January 31, 2020.

Overt Act No. 4:   On or about July 29, 2020, defendant CARTER, Co-conspirator Singleton, and others filed and caused to be filed with the SBA an EIDL application in the name of Millstone Music Group, falsely indicating that Millstone Music Group had eight employees as of January 1, 2020, and gross revenues in the amount of $765,123 from January 31, 2019 to January 31, 2020.

Overt Act No. 5:   On or about January 22, 2021, defendant CARTER, Co-conspirator Singleton, and others filed and caused to be filed with a financial institution a PPP loan application seeking $155,312 on behalf of Market Data Inc., falsely representing that Market Data Inc. had eleven employees and average monthly payroll of $62,125.

Overt Act No. 6:   On or about March 29, 2021, defendant CARTER, Co-conspirator Singleton, and others filed and caused to be filed with a financial institution a PPP loan application seeking $123,260 on behalf of an entity in her own name, Savana Carter, falsely representing that Savana Carter had eleven employees and average monthly payroll of $49,304.

Overt Act No. 7:   On or about April 19, 2021, defendant CARTER, Co-conspirator Singleton, and others filed and caused to be filed with a financial institution a PPP loan application seeking $149,165 on behalf of Ireland Solutions Inc., falsely representing that Ireland Solutions Inc. had eight employees and average monthly payroll of $59,666.

GLENN S. LEON
Chief, Fraud Section
Criminal Division
United States Department of Justice

EDWARD E. EMOKPAE
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

SIJI A. MOORE
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice